# EXHIBIT “2”

# Findings & Opinion Relevant to the Actions of Truist Bank in the matter pertaining to the actions of Powis Parker, Inc., A/A/O Formatic GmbH regarding a wire transfer to Truist Bank in the amount of $245,000 on February 4, 2022.

**re:**

**Powis Parker, Inc.,**

**A/A/O Formatic GMBH**

**Plaintiff,**

**v** **Case No.: 6:22 – CV - 01269**

**Truist Bank**

**Defendant.**

**************************

**Background:** On or around February 4, 2022 Formatic GmbH, a German Company located at Bonifatiusstr. 409, /DE/48432 Rheine, provided wire instructions to its Bank, S/Genodem1bb, Volksbank Muensterland Nord EG, Matthiasstr.30, Rheine, DE 48431 to wire the sum of $245,000 to Powis Parker Incorporated, Account Number 1000279820137 at Truist Bank. These instructions were the result of a hack by an outside fraudster who compromised the email account of Jenny Talosig, the Finance Manager for Powis Parker. The fraudsters obtained enough information and data from that breach to represent themselves to Formatic as a Powis Parker official authorized to provide wire instructions to Formatic. The fraudster, acting as an approved representative of Powis Parker, then made a request of Formatic to initiate a wire transfer to Powis Parker using the above referenced account number. In the case of this wire transfer, the Account Number 1000279820137 provided by Formatic GmbH did not belong to Powis Parker but rather was an account at Truist in the name of Gen Script USA, Inc, 802 Diane Drive, Fernandina Beach, Florida 32034-8428. Over a month later, on March 10, 2022 Truist Bank was notified of the fraudulent wire. Truist immediately blocked and subsequently closed the account of Gen Script USA. By the time Truist received notice that the wire transfer was fraudulent, the money had been withdrawn and the account balance was $0.00.

**Issue at Hand**: Powis Parker, Inc. A/A/O Formatic GmbH have filed suit against Truist Bank contending that Truist did not properly handle the receipt of the incoming wire. Plaintiff contends that Defendant was required to reject the receipt of the wire transfer into Account No. 1000279820137 by virtue of Florida Statute 670.207(2)(b).

**Assignment:** The purpose of this report is to review the facts of this case as referenced above and determine if Truist Bank 1) acted in a manner consistent with sound banking practice, 2) could have knowledge of the beneficiary name mismatch due to the automated nature of the wire transfer, 3) followed its own internal policies regarding the handling of incoming wire transfers and whether or not those policies and procedures are also consistent with the reasonable practices of similarly sized banks,

**Banking in the Digital Age:** Like all industries, banking has gone through tremendous changes in practices and procedures over the past 50 years. What was common practice in the 1970's is no longer necessarily applicable in the world of today. The advent of the computer and the demand for quick, easy, and almost instantaneous responses to customer needs has necessitated computers performing many of the tasks we once performed manually. The millions of checks that are cleared through the automatic payment system are done seamlessly each day by comparison of a bank routing number and account number. ATMs throughout the country routinely disburse cash with only a plastic card and PIN number to authorize the transaction without regard to who is holding the card. The sheer size of our economy and the vast number of transactions being processed on a daily basis makes the automated systems of today's banking system necessary and uniformly accepted as necessary to keep up with the expectations of the populace. The manual customs of past years have been replaced with computers using automation. It is against this backdrop that the actions of Truist Bank will be reviewed.

**Findings & Opinion:**

**Truist Actions Consistent with Sound Banking Practices Followed by Others:** The process of having an automated wire transfer process where an incoming wire transfer is handled by an automated system that compares only the account number furnished by the Originator Bank with the account number at the beneficiary bank is the process used by other large banks, such as Wells Fargo Bank and Bank of America.

Wells Fargo Bank is the 4th largest bank in the United States and has banking assets of $1.538 Trillion Dollars.

On November 5, 2018 Peter E. Shapiro, P.A. as Plaintiff, filed a suit against Wells Fargo Bank, N.A., as Defendant in Case No. 18-cv-60250-UU in United States District Court in the Southern District of Florida. As a part of the testimony in the Peter E. Shapiro, P.A. case the deposition of James Ansbro, an employee of Wells Fargo, was used to provide information about wire practices and procedure at Wells Fargo Bank.

The facts of the case mirror almost exactly the facts of this case in that Shapiro, accepted instructions on behalf of a client from a lawyer representing a bank to which the client owed money to wire a substantial sum of money to the bank's lawyers trust account to repay a debt at the bank. The same day that Shapiro received the defining email, he initiated the wire transfer in which he instructed his bank to wire the requested sum to Wells Fargo and named,

by account number and name, the account which was to receive the funds. The money was never received by the lawyer representing the bank and was deposited into the account of Chris Achebe. Shapiro, upon notice that the wire was not received by the attorney initiated a recall request but Wells Fargo denied it because the funds were already gone.

In deposition testimony, Wells Fargo described the wire system it uses as an electronic system called the Money Transfer System (MTS). When a wire transfer identifies a valid Wells Fargo account number, the MTS system processes the transfer through an automated process.

Mr. Ansbro was asked a question about Wells Fargo's actions and procedures when there is a mismatch between the intended and actual beneficiaries in an incoming wire transfer from another bank. Mr. Ansbro answered as follows:

> "Well, considering the – the transaction involved here, there – there were no actions or procedures because the system processed the transaction in a - in a ---in an automated way, with the exception of the sanction screening process. Then we – you know, and I can talk it about that more specifically.
>
> But other than the sanctioning screening process, the –the—the transaction was processed automatically by our system and without any operator of human intervention.

Further on in the deposition, Mr. Ansbro was asked further questions about the mismatch condition generated by the automated system. The question and answers were as follows:

> Q- Okay, sir. So, following up on this system memo that says "possible name mismatch in CDT party," would you agree that the Wells Fargo system noticed what we talked about on the first page of Exhibit 9, that the – there was a difference between the party to be credited at Wells Fargo from the party identified as the beneficiary on Citibank?
>
> A – The system memo does reflect that, yes.
>
> Q – Would you agree that the system created a warning – of a mismatch
>
> A - No, I would not call it a "warning," because it's – its not seen by anybody. Its – it's something that the system creates, but since there's no operator involved in the processing of the transaction, I wouldn't call it a warning.
>
> Q – So the purpose of – of checking this – this system is checks for a mismatch, but you're telling me once it finds it, it's ignored?
>
> A – I'm – the – the system looks for a valid account number. If the system finds a valid account number, then that's the account number that ends up being credited, and the system alert memo reflects that the account number may not be an exact match to the – to the name provided.

> Q – After the system notice the mismatch, was it the information simply ignored?
>
> A – The way I would put it is that when the – when there's a match to a valid account number, that's all that matters to the system: That the account number is valid, it matches a credit party, and that's what the system in a fully automated way decides is – becomes the credit party for the transaction.

Other large banks also credit wire transfers using only the account number. For example, Bank of America is the 2nd largest bank in the United States and has banking assets of $2.4 Trillion Dollars. On September 4, 2020, Madison Title Agency, LLC sued Bank of America in the United States District Court for the Northern District of Georgia in Case No. 1:20-CV-03674-VMC. In Madison Title Agency, LLC, the deposition of Jenny Karkas on September 29, 2021 was used by the Court to ascertain the wire transfer practices of Bank of America. Bank of America, like Wells Fargo and Truist, also uses an automated system to process wire transfers which credits the payment using solely the account number. Even though the courts found Bank of America and did not check for a beneficiary name match, the court did not find Bank of America liable under the same UCC provisions at issue here, as codified in Georgia. *See* April 20, 2023 order granting summary judgment in Madison Title Agency, LLC.

**Opinion:** The size of a bank and the volume of transactions it handles on a daily basis impacts what bank practices reasonability dictates it employ. In order to handle a large volume of transactions, large banks use automated systems to handle the large volume of transaction that are processed daily. Truist Bank is the 8th largest Bank in the United States with just under $600 Billion Dollars in assets. The system used by Truist for the automation of wire transfer will credit the incoming payment using only the account number, which is also the methodology employed at similarly sized banks, like Wells Fargo and Bank of America. Thus, it is my opinion that the Truist system for the handling of wire transfers mirrors closely that of Wells Fargo and Bank of America and is consistent with reasonably sound banking practices practiced by similarly sized banks in the United States.

**Truist's Knowledge:** In the State of Florida Chapter 670 of the Florida Statutes deals with wire transfers and in Title XXXIX Commercial Relations, Chapter 670 Uniform Commercial Code: Funds Transfers, Section 207 Misdescription of beneficiary. Section 207 deals in part as follows:

(1) Subject to subsection (2), if in a payment order received by the beneficiary's bank, the name, bank account number, or other identification of the beneficiary refers to a nonexistent or unidentifiable person or account, no person has rights as a beneficiary of the order and acceptance of the order cannot occur.

(2) If a payment order received by the beneficiary's bank identifies the beneficiary both by name and by an identifying or bank account number and the name and number identify different persons, the following rules apply:
   (a) Except as otherwise provided in subsection (3), if the beneficiary's bank does not know that the name and number refer to different persons, it may rely on the number as the proper identification of the beneficiary of the order. The beneficiary's bank need not determine whether the name and number refer to the same person.

(3) If a payment order described in subsection (2) is accepted, the originator's payment order described the beneficiary inconsistently by name and number, and the beneficiary's bank pays the person identified by number as permitted in paragraph (2)(a), the following rules apply:
   (a) If the originator is a bank, the originator is obliged to pay its order.
   (b) If the originator is not a bank…

(4) In the case governed by paragraph (2)(a), if the beneficiary's bank rightfully pays the person identified by number and that person was not entitled to receive payment from the originator, the amount may be recovered from the person to the extent allowed by the law governing mistake and restitution...

The statute clearly states than when the name and number identify different persons that the beneficiary bank may rely on the number as the proper identification if the bank does not know the name and account number refer to different persons. It also states that the beneficiary's bank need not determine whether the name and number refer to the same person.

**Opinion:** Truist could not have known of the difference between the beneficiary name and the account name because the wire transfer was an automated transaction where the numbers are read by the computer and the account number provided matched an account at Truist. Since the bank is not required to determine whether the name and number refer to the same person Truist acted consistently with reasonable routines and the due diligence required in Florida for banks to deposit wire transfers into the account identified by the account number, without examining for a beneficiary name match to the name associated with the account.

**Truist Actions Consistent with Internal Policy, and Whether that Policy and Procedure is Consistent With Reasonable Banking Practices:** Truist maintains an extensive 32-page document entitled "Wire Transfers (Domestic)" which is the effective Policy and Procedures Manual for the processing and handling of all manner and type of wire transfers. The large portion of this document covers the processing and handling of outgoing wire transfers where the bank is originating a wire transfer to a party at another bank. Section 28 of the document deals with the process of accepting an incoming wire transfer. The policy deals with the following points:

1) The branch which holds the account is not notified when a wire is received.
2) Wires can be received and posted until 7:00 p.m. (EST)

3) Funds received are collected and are immediately available to the client
4) The credit received once posted will be shown in the Total Collected Available Balance
5) To access the clients available balance key the clients account in WPI and the balance will be displayed
6) If the sending financial institution requests, a recall Wire Transfer Operations (WTO) will handle the approval in coordination with the branch. If fraud is suspected this process may be handled as an exception to this procedure.

It should be noted that there is no reference in Truist's policies and procedures requiring a manual match of the account name listed on the incoming wire notification and the name on the account identified by the account number.

The next section of this policy involves deposits to a DDA or Savings accounts. These points are to advise clients expecting an incoming wire to advise the originator to provide the following information:

1) BB&T's ABA number. Refer to Account Number Structure Online Resource Manual for a list of Truist routing numbers.
2) Valid DDA or savings account number to be credited. *If the wire transfer is received With an invalid or closed DDA or savings account number, WTO will return the funds to the sending bank.
3) The name on the DDA or savings account.

It should also be noted that the above information requested by Truist is when Truist is asked to provide the originator with the information with which to originate a wire. In the case at hand, it appears Truist received this incoming wire without prior notice and therefore such communications to the sending bank were not required by Truist's policies and procedures.

Nowhere in this section of the Truist policies and procedures relating to incoming wire does it say that a Truist employee should compare the beneficiary name the originator provided with the name on the account to be credited during an incoming wire. Indeed, the branch is not even notified.

As a part of the submissions by Truist, it provided an Affidavit from Tina M. Williams who is a Branch Operations Partner employed by Truist Bank and is authorized to provide information about the wire at issue and about Truist's handling of wire transactions. The salient portions of Ms. Williams Affidavit are as follows:

1) Wire Transfer was processed electronically through a fully automated system called the Money Transfer System (MTS)* **Note**: This is the same electronic system that is used by Well Fargo.

2) MTS interfaces electronically with Truist's system to look up the account number provided in the Wire Transfer Instructions and see if it matches a valid Truist account number.
3) For the Wire Transfer, the automated system matched the account number provided in the instructions for the transfer with the Truist account that held the same number. Thus, because the systematic lookup of the account number was successful, the transfer was processed electronically.
4) The automated process outlined above does not conduct a check on the beneficiary name identified in the incoming wire transfer instructions or attempt to match the beneficiary name with the name of the account holder. The transfers are processed based solely on account number.
5) On March 10, 2022, Truist received a reversal request from Bank of America for the wire transfer that was made on February 7, 2022 to the account number 1000279820137. This request was denied because the funds had already been removed from the account.
6) At no time prior to March 10, 2022 was anyone at Truist aware of a beneficiary name mismatch regarding the Wire Transfer.

**Opinion:** It is apparent from the reading of the Truist policies and procedures relating to incoming wire transfers that the bank did not have a policy to match the name on the originators wire transfer information to that of the beneficiary. From the Affidavit of Ms. Williams, Truist uses the same wire transfer system (MTS) that is used by Wells Fargo and operates with the same automated procedures that when the account number of the incoming wire instructions matches that of a valid account number at the beneficiary's bank that the automated process continues and the money is credited to that account. That is consistent with how wire transfers are handled at Wells Fargo and Bank of America. As a result, it is my opinion that Truist not only followed its own policies and procedures but that the Truist's policies and procedures are materially consistent with the reasonable practices employed by other similar sized banks in the United States.

**Final Opinion:** In my opinion Truist acted in a manner consistent with accepted banking protocols in the manner of handling the wire transfer that is the subject of this case. This opinion is driven by the following observations: 1) Truist policies and procedures did not require a check of the beneficiary name and account number name to complete a wire transfer that referenced a valid account number,  2)Truist's policies and procedures, and its actual conduct during the wire transfer at issue, were reasonable and consistent with prevailing banking processes utilized by other large banks like Wells Fargo and Bank of America in similar circumstances, 3) Truist could not have knowledge of the beneficiary name mismatch due to the automated process employed for the wire transfer, and 4) this automated process is also consistent with the reasonable process employed by other large banks like Wells Fargo and Bank of America.

The opinions expressed above are within a reasonable degree of banking protocol and certainty. They are based on the documents reviewed which are outlined in Addendum A and should I become aware of other information not presently known to me, I reserve the right to change my opinion.

________________________________________

G. Geoffrey Longstaff

# Exhibit A

# Documents Relied on in Preparation of Expert Testimony of G. Geoffrey Longstaff in the matter pertaining to Powis Parker, Inc., A/A/O Formatic GmbH, Plaintiff, vs Truist Bank, Defendant

1. First Amended Complaint filed 8/9/2022 by Powis Parker, Inc., A/A/O Formatic GmbH, Plaintiff vs Truist Bank, Defendant, Case No.: 6:22 –CV-01269
2. Truist Internal Recap of Wire Transfer Specifics TRN 20220207- 0052697
3. WireOp Framework Page 1 of 1
4. Florida Statutes 670.207
5. Order dated Nov. 5, 2018 in Peter E. Shapiro P.A. Plaintiff vs Wells Fargo Bank, N.A., Defendant, Case No. 18-cv-60250-UU
6. Wikipedia List of the Largest Banks in the United States
7. Deposition of James Ansbro in the matter of Peter E. Shapiro, P.A., Plaintiff, vs Wells Fargo Bank, N.A., Defendant, Case No. 18-cv-60250-UU
8. Order dated April 20, 2023 in *Madison Title Agency, LLC v. Bank of America, N.A.*
9. Expert Opinion of Don Coker dated June 27, 2023
10. Truist Document Production Bates 000001-0000086.

# G. Geoffrey Longstaff

6416 Aldworth Lane, Charlotte, NC 28226

Email: glongstaff200@gmail.com

Cell Phone: (407) 314-8381

## AREAS OF EXPERTISE:

### Expert Witness:

- Has served as an expert witness in areas of banking relating to commercial lending, construction lending, loan approval procedures and policies, SBA origination and closing, as well as areas generally relating to bank management.

- Has served as an expert witness in areas of commercial business relating to partnership and LLC structures, financing structures, and activities incident thereto.

### Consulting:

- Has served as a consultant to small business clients and their principals in areas of operational structure, structuring of debt and equity acquisition, assistance with negotiating debt structures and the documentation relating thereto, and development of Board of Director structures

## CURRENT INVOLVEMENT:

- Serves as a Director of One Florida Bank in Orlando, Florida
- As a commercial real estate developer, was a Principal in Small Bay Partners, LLC
- Has over 35 years of experience as a banker in the Central Florida marketplace
- Serves as a business consultant to various commercial ventures throughout the U.S.
- From 1998 to 2021, served as an Instructor at the Graduate School of Banking at Louisiana State University (LSU) in Baton Rouge, Louisiana
- Serves as a expert witness in banking and lending issues

## EDUCATION:

- Master of Business Administration (MBA) degree from the Crummer Graduate School of Business at Rollins College, Winter Park, Florida
- Bachelor of Arts (BA) degree from Rollins College in Winter Park, Florida

## BANKING BACKGROUND:

- **2019 – Present**
  **Director – One Florida Bank, Orlando, Florida**
- **2015 – 2018**
  **Chairman & CEO of Mercantile Capital Corporation, a wholly owned subsidiary of IBERIABANK**
- **2010 – 2015**
  **Director, Old Florida National Bank, Orlando, Florida**
- **1999 – 2000**
  **Director, President & CEO, First National Bank of Central Florida, Winter Park, Florida**
- **1997 – 1998**
  **Market President, Regions Bank/Orlando**
  ***Assumed this position as a result of Regions acquiring First Mercantile National Bank***
- **1987 – 1997**
  **Director, President & CEO, First Mercantile National Bank, Longwood, Florida**
  ***Founded this bank in 1988 which sold to Regions Bank in 1997.***
- **1986 – 1987**
  **Director, President, & CEO, First National Bank of Seminole County, Longwood, Florida**
- **1982 – 1984**
  **Director, President & CEO, Flagship National Bank of Broward County, Hollywood,**

## EMPLOYMENT HISTORY

- **2002 – 2018**
  **Chairman, CEO & Cofounder, Mercantile Capital Corporation, Orlando, Florida**
- **2000 – Present**
  **Partner, Small Bay Partners, LLC – Maitland, Florida**
- **2000 – 2004**
  **Chief Operating Officer, NAI Realvest, Maitland, Florida**
- **1999 – 2000**
  **President & CEO, First National Bank of Central Florida, Winter Park, Florida**
- **1997 – 1998**
  **Market President, Regions Bank, Orlando, Florida**
- **1988 – 1997**
  **President & CEO First Mercantile National Bank, Longwood, Florida**
- **1986 – 1987**
  **President & CEO, First National Bank of Seminole County, Longwood, Florida**
- **1984 – 1986**
  **President & CEO, State Savings & Loan Association, *In Organization*, a wholly owned subsidiary of Development Corporation of America**
- **1982 – 1984**
  **President & CEO, Flagship National Bank of Broward County, Hollywood, Florida**

## COMMUNITY INVOLVEMENT

- **From 1999 – 2011, served as a member of the Board of the Sanford Airport Authority and served as Chairman of the Board from 2004 – 2011. The Authority was responsible for operating the Orlando-Sanford International Airport.**
- **From 1996 – 2008 served as a member of the Board of Community Communications, Inc and Chairman from 2005 - 2006 which operated WMFE Channel 24 / 90.7 FM for public television and radio broadcasting in Orlando, Florida.**

## EXPERT WITNESS BACKGROUND

- **Everbank v Amberleigh, LLC – Case No: 2009-CA-025590 – In the Circuit Court of the Ninth Judicial Circuit in Orange County, Florida**
- **D.I. Ramirez Sr. v American First National Bank – Trial Court – Case No: 2014-26602 – 190th District Court, Harris County, Texas**
- **FDIC (As Receiver for Wakulla Bank) v Dodson, Galy, Versiga, Bryant, & Roberts – Case No: 4:13-CV-0046 – U.S. District Court for the Northern District of Florida**
- **Nicole Wilkens v Juan Carlos Quiroga and Monica Quiroga Salazar – Case No: 2017-CA-0038220 – In the Circuit Court of the Ninth Judicial Circuit in Orange County, Florida**
- **PRN Real Estate and Investments, Ltd., et. al. v William W. Cole, Jr. et. al., - Case No: 2014-CA-011835-0 in the Circuit Court of the Ninth Judicial Circuit in Orange County, Florida**
- **Dean K. Jennings, et. al. v Allan E. Keen, et. al., - Case No: 2016-CA-9301 in the Circuit Court of the Ninth Judicial Circuit in Orange County, Florida.**
- **Powis Parker, Inc., & A/A/O Formatic GmbH v. Truist Bank, - Case No.: 6:22– cv–01269 in the United States District Court for the Middle District of Florida, Orlando Division**